UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 23-cr-247 (JMC) |
| v. : | |
| : | |
| KARTHIK RAMAKRISHNAN, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Karthik Ramakrishnan to 36 months' probation with 90 days of home confinement as a condition of that term of probation. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement, $500 in restitution.

I. Introduction

Ramakrishnan, a 45-year-old medical doctor from southwest Virginia who operates medical clinics, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Ramakrishnan pled guilty to engaging in disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol, in violation of 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by Ramakrishnan's (1) early entrance into the Capitol through the Senate Wing Door amidst signs of a violent entry by other rioters; (2) constant banging of a drum while parading through the Capitol; (3) remaining in the Capitol for more than twenty minutes, during which time he took a wide-ranging path through the building; and (4) minimization of his unlawful conduct on January 6 when he was interviewed by FBI agents following his arrest earlier this year.

The Court must also consider that Ramakrishnan's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Ramakrishnan's crime support a sentence of For the reasons set forth herein, the government requests that this Court sentence Ramakrishnan to 90 days home confinement and 36 months' probation in this case.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 20.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Ramakrishnan's Role in the January 6, 2021 Attack on the Capitol*

Ramakrishnan travelled with his family to the Washington, D.C., area from his home in Bluefield, Virginia, on the evening of January 5, 2021. On the morning of January 6, he attended the rally hosted by the former president at the Ellipse before moving to the Capitol building. Ramakrishnan approached the Capitol from the west.

At 2:13 p.m., rioters breached the Senate Wing Door. Rioters broke and climbed through windows on either side of the door and then opened the locked door from the inside. The crowd outside then flowed through the now open door into the Capitol. Because the crowd had breached locked doors and smashed windows, alarms were sounding as the crowd began to flow into the building. At 2:19 p.m., Ramakrishnan approached the Senate Wing Door wearing an orange and brown Burton ski coat, blue jeans, black ski cap, red backpack, red gloves, and a surgical mask while banging a small drum. *See* Figure 1; *see also* Gov. 1 at 05:59-06:50



*Figure 1. Screenshot from Gov. 1 at 06:36.*

Ramakrishnan paused outside for several seconds and banged his drum. *See* Gov. 1 at 06:34-07:19; *see also* Gov. 2 at 00:00-01:08. At 2:20 p.m., Ramakrishnan, walking past shattered windows and despite the sound of a blaring alarm, entered the Capitol through the Senate Wing Door at 2:20 p.m. *Id.*; *see also* Figure 2.



*Figure 2. Screenshot from Gov. 2 at 00:41.*

Between approximately 2:22 p.m. and 2:32 p.m., Ramakrishnan, still beating his drum, moved from the Crypt to Statuary Hall and then to the Statuary Hall Connector.[2] *See* Figure 3.



*Figure 3.*

---

[2] At some point between 2:20 p.m. when he entered the Capitol and 2:32 p.m. when he passed through Statuary Hall, Ramakrishnan removed his Burton ski coat to reveal a cream-colored sweater. He continued wearing the sweater and a cranberry-colored backpack for the duration of his time in the Capitol.

4

While Ramakrishnan was inside the Statuary Hall Connector, he pulled out an iPad and used it to take a photograph of the mob that was trying to advance to the House Chamber.[3] *See* Figure 4.



*Figure 4.*

Between 2:42 p.m. and 2:46 p.m., Ramakrishnan moved with a large crowd from the East Stairs to the Main Door Hall located on the north side of the House Chamber. *See* Figure 5. Ramakrishnan walked down this hallway with the crowd after another rioter signaled that there was a path open. *See* Gov. 3 at 05:39-05:50. As he walked, Ramakrishnan looked out the windows into the East Plaza and the crowd that had amassed there. *Id.* at 06:13-06:39. Ramakrishnan, finding his way blocked by officers, doubled-back into the Main Door Hall where he stood for a little more than one minute. *See* Figure 5; *see also* Gov. 3 at 09:38-10:30. He continued to beat his drum. *Id.* at 10:22-10:24.

---

[3] Incident to his arrest, Ramakrishnan provided the iPad he used to take photographs in the Capitol to the FBI. The FBI searched the iPad and located photos consistent with having been taken inside of the Capitol.

5



*Figure 5. Screenshot from Gov. 3 at 10:27.*

Starting at approximately 2:44 p.m., officers in the Main Door Hall blocked the rioters, including Ramakrishnan, from advancing further into the Capitol. Rioters began to amass in the Main Door Hall and ignored instructions from the officers to turn around. In response to the increased agitation of the crowd and to disperse the growing group within the hall, United States Capitol Police officers deployed chemical irritants into the air.

While these events were occurring, Ramakrishnan was standing near the front of a group of rioters looking in the direction of police. Some members of the group in which Ramakrishnan was standing were heckling the officers, shouting "Defend the constitution against all enemies foreign and domestic!", "That's the oath you took, you took, you took, all of you fucking took! You!", "They ain't here to protect our fuckin' liberties.", and "Don't look away, motherfuckers!" *See* Gov. 4 at 1:00-2:06. Ramakrishnan did not personally shout anything at these officers, but he did stand at the head of the crowd and beat his drum. *Id.*; *see also* Gov. 3 at 10:10-10:25. Ramakrishnan, who was standing at the head of a group of rioters, turned to look at where the cloud of chemicals had begun to form. He then covered his mouth with his sweater and slowly advanced towards the officers in front of him. *See* Figure 6; *see* Gov. 3 at 10:40-10:46.

6


*Figure 6. Screenshot from Gov. 4 at 01:52.*

Signaling that he was feeling the effects of the chemical irritants, Ramakrishnan had a brief, unrecorded exchange with a police officer. He then turned right down a hallway and walked a short distance before coming to the East Front House Door. Ramakrishnan, still holding the small drum in his hands and wearing his cranberry-colored backpack, exited the Capitol via the East Front House Door at 2:47 p.m. *See* Figure 7; *see also* Gov. 5.


*Figure 7.*

*Defendant's Interview*

On June 15, 2023, Ramakrishnan was arrested on a criminal complaint charging him with four misdemeanors in connection with his participation in the events at the Capitol. Ramakrishnan waived his *Miranda* rights and gave an interview to the arresting agents at his home.

Ramakrishnan told the agents that he supported the former president in the 2020 election He decided to go to D.C. for the rally on January 6 after the former president put out a call to do so to his supporters via Twitter. Ramakrishnan stated that he chose to stay in Maryland rather than D.C. on the night of January 5 because he was afraid that a riot would occur in D.C. Ramakrishnan attended the "Stop the Steal" rally on the morning of January 6. He was able to enter the Ellipse itself for the rally after waiting in line for security for more than an hour. After the former president addressed the crowd, Ramakrishnan exited the Ellipse and began to move with the crowd towards the Capitol "to make their voices heard." Ramakrishnan denied knowing specifically where the crowd was heading.

Once the crowd reached the Capitol, Ramakrishnan claimed that the protest began to "get out of hand." He stated that he was banging on his drum and chanting "no violence." Ramakrishnan acknowledged feeling the effects of tear gas while he was at the Capitol. Ramakrishnan claimed that the metal barricades establishing the restricted perimeter had been moved by the time he got to the Capitol so he had "a straight walk all the way in." He claimed that he tried to dissuade people from climbing the walls to the Capitol because he was afraid that they would fall off.

Ramakrishnan acknowledged that he saw someone had "busted down" the scaffolding near the Northwest Stairs and that everyone "piled in up that staircase." Ramakrishnan said the people were shouting and screaming at this point but denied seeing any violence. He said that he heard

8

people referencing Jericho[4] and stated that this made him believe that the plan was shout to "until everybody listens." Ramakrishnan then climbed the Northwest Stairs and entered the courtyard. He denied damaging any property or physically engaging with any police officers.

Regarding his actual entrance into the Capitol, Ramakrishnan was less than truthful. He claimed that he was "literally getting pushed through" and that he was "kind of in shock." Ramakrishnan said that other rioters signaled him to come in through the "broken door into the Capitol." He described the atmosphere as a "prank vibe." Ramakrishnan, contradicting the video evidence of him outside of the Capitol and walking into the building, described his entry to the Capitol as being "very condensed" with "no chance to get out." Again, contradicting the video evidence and the fact that other people were able to exit the Senate Wing Door at the approximate time that Ramakrishnan entered, he claimed that he "was trying to get out from immediately from going in" and that he just "winded through" with the crowd. Ramakrishnan acknowledged that entering the Capitol was a mistake and that he knew it was a mistake from the moment he entered.

Ramakrishnan said that he left the Capitol because things were escalating. He admitted that, while inside the Capitol, he learned that a person had been shot in the vicinity of the House Chamber but denied seeing the shooting.[5] According to Ramakrishnan, things were "getting crazy" so he asked an officer how to leave and was directed to an exit.

When agents referenced the Burton jacket that he had worn to the Capitol, which agents had found during the search of his home, Ramakrishnan said that he had thought about "burning

---

[4] This is a reference to a biblical story from the Old Testament wherein a group of people marched around secured walls of a city for six days before blowing a horn on the seventh day and bringing the walls of the city down.

[5] Based on his location relative to where the shooting took place, it is likely that Ramakrishnan would have heard this shooting, which took place at approximately 2:44 p.m. However, Ramakrishnan made no explicit reference to having heard the shooting in his interview.

that thing." Ramakrishnan acknowledged having photos taken inside of the Capitol on his phone. Ramakrishnan then laughed and asked the agents "what took [them] so long" to arrest him. Ramakrishnan said that he had looked for himself on the FBI's website but did not see any images of himself. He did acknowledge seeing his face in one video from the Capitol.

Ramakrishnan said that he regretted his participation in the events of January 6 and directed the agents to where the items that he brought with him to the Capitol were located in his house. He also repeated asked if cooperating with the agents would benefit him in terms of his post-arrest release and his criminal case.

*The Charges and Plea Agreement*

On July 25, 2023, the United States charged Ramakrishnan by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On September 7, 2023, pursuant to a plea agreement, Ramakrishnan pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C 5104(e)(2)(G). By plea agreement, Ramakrishnan agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Ramakrishnan now faces sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Ramakrishnan faces up to six months of imprisonment and a fine of up to $5,000. Ramakrishnan must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 36 months' probation with 90 days of home confinement as part of that term of probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ramakrishnan's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ramakrishnan, who did not assault any officers or destroy any property inside of the Capitol, the absence of violent or destructive acts is not a mitigating factor because if he had engaged in such conduct, he would have faced additional criminal charges.  Ramakrishnan should get no credit for crimes the crimes that he did not commit.

One of the most important factors in Ramakrishnan's case is that he not only entered the Capitol freely and of his own accord but that, through the constant banging of his drum, he cheered on the riotous mob as its members ransacked the Capitol and heckled officers. While he did not engage in any violent or destructive acts himself, he readily gave them his endorsement through the relentless banging of his drum which he used to rile up and cheer on the mob. Accordingly, the

11

nature and the circumstances of this offense establish the clear need for a lengthy sentence of probation with home detention in this matter.

### B. Ramakrishnan's History and Characteristics

Ramakrishnan is a licensed medical doctor who operates a number of medical facilities in southwest Virginia and eastern West Virginia. As a medical doctor, he is well-educated and has used his medical degree to earn a comfortable lifestyle for himself and his family. His father and two brothers are also trained physicians and are employed as such. PSR ¶¶40-41. Ramakrishnan's operating medical practices in a historically underserved region shows that he is someone who provides for his community. He was raised in a supportive home by both parents. *Id.* at ¶38-39. Ramakrishnan has had prior interactions with the criminal justice system, including 2004 conviction for speeding and refusing to submit to a breath test. *Id.* at 32.[6]

While Ramakrishnan's education and medical practice is laudable, it renders his conduct on January 6 very troubling. As a medical doctor and business owner, Ramakrishnan is more than capable of gathering information prior to making a decision and to not act on impulses or contrary to established rules or principles. Yet, in spite of his substantial education and clear intelligence, Ramakrishnan chose to join in a riotous mob and cheer that mob on as it launched an assault on our seat of government and the peaceful transition of power. As he made his approach toward the Senate Wing Door, he saw the broken glass and surely would have heard the deafening alarm that was ringing as he walked through those breached doors. Someone of his education and intelligence had the information available to him about the need to turn back and not enter the Capitol, but

---

[6] Ramakrishnan also reported that he was twice charged with and possibly convicted of driving under the influence while he lived in Tennessee during his medical residency. PSR ¶ 33. This information is supported by records from West Virginia Board of Medicine, but there is no record of it in Tennessee state court records.

12

Ramakrishnan—banging his drum—crossed the threshold into the building and stayed inside for twenty-seven minutes.

Ramakrishnan also was less than truthful with the interviewing FBI agents about the circumstances that led to him crossing that threshold. He told them that he was effectively pushed into the building. Yet, as is apparent in Gov. 1 and 2, Ramakrishnan, with no one behind him, climbed a set of stairs, banged on his drum, and then would have had to inject himself into the stream of people moving into the Capitol through the Senate Wing Door. Upon entering the Capitol, Ramakrishnan made no effort to turn around and head back out the door as he claimed to the FBI agents during his interview. Instead, he oriented himself briefly before raising his drum over his head and banging it as he walked down the hallways to the right of the door. Ramakrishnan thus minimized his criminal conduct and obfuscated blame for it when the FBI interviewed him.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

particular defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of the government's recommended sentence of thirty-six months of probation with ninety days of home confinement. As discussed above, Ramakrishnan is a person of well-above average education and intelligence, and a reasonable person of that level of intelligence and education should have been able to process the situation unfolding around him on January 6, 2021, and turn back. But Ramakrishnan chose instead to ignore these warning signs and engage in criminal conduct. As he approached the Senate Wing Door, there were obvious signs that he was entering the scene of riot all of which he acknowledged in his FBI interview: he sensed chemical irritants in the air as he approached the Capitol, he saw people engaging in dangerous conduct by climbing the walls on the West Front, he saw that people—in his own words—had "busted down" the scaffolding, and he saw the broken glass on the door as he entered the Senate Wing Door. None of these self-acknowledged signs deterred him.

In his FBI interview, Ramakrishnan recounted how he had to wait in line for more than an hour to get through security and into the Ellipse. A few hours later, though, he walked past a

14

sounding alarm, through a broken door, and over pieces of shattered glass into a government building, which any reasonable person of Ramakrishnan's intelligence and education would know is subject to security restrictions. He also minimized the seriousness of the riot at the Capitol itself when he described the atmosphere as having a "prank vibe." Also in his FBI interview, Ramakrishnan acknowledged that entering the Capitol was a mistake and appeared to demonstrate remorse at having done so. However, that Ramakrishnan's account of his entry into the Capitol is significantly different from the video of that event is evidence that he must be further deterred from engaging in this conduct again because he sought to minimize his own culpability for the offense and distribute it on to the crowd even while accepting at least some culpability.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence Ramakrishnan based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Ramakrishnan has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Guidelines do not apply, U.S.S.G. § 1B1.9. However, the sentencing factors in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jason Comeau*, 21-cr-629 (RC), the defendant pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G). Like Ramakrishnan, Comeau saw people climbing the walls on the West Front of the building but, unlike Ramakrishnan, also contemplated doing so himself. Comeau entered the Capitol through the Senate Wing Door fifteen minutes after it had been breached, whereas Ramakrishnan entered it within ten minutes. Like Ramakrishnan, Comeau saw many warning signs that he should not enter the approach or enter the building. Both Comeau and Ramakrishnan cheered on the riot, Comeau using his voice and Ramakrishnan his drum. Comeau, like Ramakrishnan, took a wide-ranging path through the building and spent time in the corridors outside the House Chamber. Unlike Ramakrishnan, Comeau is not a medical doctor. But, like Ramakrishnan, Comeau did minimize his conduct. Judge Contreras sentenced Comeau to twelve months of probation with two months of home confinement.

In *United States v. David Johnston*, 22-cr-182 (BAH), the defendant pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G). Johnston, like Ramakrishnan, entered the Capitol within ten minutes of it being breached despite the fact that he saw many signs of an ongoing riot around him. Johnston also entered the building through the Senate Wing Doors within three minutes of

16

Ramakrishnan and thus had access to the same information about the riot that was happening at the location. Both Johnston and Ramakrishnan cheered on the crowd of rioters around them and documented their time in the Capitol with photographs. Like Ramakrishnan, Johnston has an advanced degree, but his is in law rather than medicine. Johnston pled guilty, but, unlike Ramakrishnan, wrote extensively and gave several recorded statements to media claiming that his prosecution was politically motivated. Judge Howell sentenced Johnston to three years' probation with ninety days of home confinement and 21 days of intermittent incarceration.

Ramakrishnan engaged in like conduct to both Comeau and Johnston and should be sentenced similarly. A sentence including intermittent confinement was warranted in the Johnston case because the defendant had made numerous statements indicating that he had not accepted responsibility for his actions despite entering into a plea agreement. Unlike Johnston, Ramakrishnan has clearly accepted responsibility as demonstrated by his cooperation with the agents during his arrest and search of his home and quick entry of a plea, and he should receive credit accordingly.  But Ramakrishnan should also receive a lengthier term of probation and home confinement than Comeau, who had worked a series of blue-collar jobs, had no advanced degrees, and did not own any successful medical practices, because Ramakrishnan—put plainly—should have known better than to engage in the conduct that he did when he entered the Capitol.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ramakrishnan must pay $500 in restitution, which reflects in

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

part the role he played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Ramakrishnan's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 36 months' probation with 90 days of home confinement, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Ramakrishnan's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).